Hi-Hat Lounge, Inc., Plaintiff-Appellant, v. The State of Illinois Liquor Control Commission, an Administrative Agency, and Howard Cartwright, Defendants-Appellees.

Gen. No. 52,121.

First District, Third Division.

June 20, 1968.

M. J. Berkos, of Chicago, for appellant.

William J. Clark, Attorney General of State of Illinois, of Chicago (John J. O'Toole and A. Zola Groves, Assistant Attorneys General, of counsel), for appellees.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This is an appeal from the order of the Circuit Court of Cook County, sustaining the action of the Illinois Liquor Control Commission in revoking the State Retail Liquor License issued to the plaintiff for violations of the Liquor Control Act and Revised Rule 3 of the Rules and Regulations adopted by the Commission. The charge against the plaintiff by the Commission was that the plaintiff on the 23rd day of September, 1966, and on the 24th day of September, 1966, permitted solicitation for prostitution on the licensed premises, in violation of the provisions of the Liquor Control Act of the State of Illinois (Ill Rev Stats 1965, c 43), and the Revised Rule 3 heretofore mentioned. Said rule provides in part:

> "1. That no person holding a license issued by this Commission shall permit in the conduct of the licensed business or upon the licensed premises:
>
> . . . . . .
>
> "(c) Suffer or permit a violation of any law of the State of Illinois or of any rule of this Commission";

The plaintiff contends that the finding of the Commission was contrary to the manifest weight of the evidence. The facts are these:

On the 24th day of September, 1966, at about 12:00 o'clock midnight, Officer William Smith of the Cook County Sheriff's Police entered the premises of the Hi-Hat Lounge, located at 2246 South Cicero Avenue, Cicero, Illinois, with Officer James Larkin of the Cook County Sheriff's Police. They sat down at the bar and ordered two drinks. After having had two or three drinks apiece, a Miss Grace Brown approached Officer Smith who ordered a drink for her from Mr. Poulos, who was one of the bartenders behind the bar. Smith testified that Miss Brown told him to just tell the dark-haired bartender that the drink was for her and that he would know what to make. Smith testified that he told the bartender. The bartender then took a bottle of seltzer, filled a glass half full of seltzer water and filled the other half of the glass with tap water. Smith gave one drink to Miss Brown and he purchased a bottle of beer for Mrs. Rosemary Williamson. He testified that Miss Brown then asked him if he cared to have a "good time." He asked her what she meant by a "good time" and she said, "You know what I mean." He also testified that she said "half and half." He then asked her what she meant by "half and half" to which she answered, "Half suck and half —." Smith then asked her if she could get a girl for his friend, to which she answered, "Yes" and she called Rosemary Williamson to the bar who said she would go with them. Smith further testified that while this conversation was being carried on between him and Miss Brown the bartender was behind the bar about 2½ feet from Smith. They then left the bar and sat at a table about six or seven feet from the bar. The testimony also showed, according to Smith, that the bartender

445

Poulos was taking the money while Smith was talking to the girl, and that Poulos went to the cash register and returned with the change. The entire conversation took about sixty seconds. There were approximately twenty people seated on stools at the bar and these people were talking. There were two bartenders serving drinks to the customers at the bar. Smith testified that the bartender did not lean over the bar and listen to what he and the girl were saying at the time. The testimony also showed that there was a jukebox in the lounge but Smith could not recall whether the jukebox was playing music during that time. The only conversation Smith had with the bartender was the ordering of drinks, and he did not ask the bartender about the girls.

Smith testified that his tone of voice while talking to the girl was the same as when he ordered the drinks. Smith also testified that the bartender Poulos went up and down serving drinks to various customers during the 45 minutes while he was there.

Officer James Larkin testified he overheard the conversation that took place between Officer Smith and the girl. Thereafter the two officers, who were dressed in plain clothes, and Miss Brown and Mrs. Williamson left the bar. There was testimony that they went to a hotel a block away, and that the girls were arrested for prostitution by the two officers in separate hotel rooms. They then came back to the Hi-Hat Lounge and arrested Poulos, the bartender.

After the testimony of the two officers the Chairman of the Illinois Liquor Control Commission asked Larkin whether anyone had approached him in reference to this matter outside of counsel for the Commission. He also asked Larkin if anybody had asked him to soften his testimony and say that the licensee or his agent did not have any knowledge of what went on between the women and the officers. Larkin's answer was no. The Commission Chairman then asked him if, when he made an in-

vestigation like this, one of his superiors had not advised him that these conversations had to be known or heard by the bartender, the licensee or their agents. His answer to that inquiry was "Yes, Sir." He answered the next question by stating, "I don't understand, Sir." The Chairman then said, "Well, if you don't understand let's have the other man. Maybe he understands." The Chairman then said to Officer Smith, "You mean you went in there and made an investigation, with your experience, with the instructions (that had been given to him by his superiors) and that you didn't know that you have to have these conversations so that the licensee can hear them?" After further questioning by the Chairman of the Commission Smith was excused and Tom Poulos, the bartender, testified to the following:

He was the manager of the Hi-Hat Lounge. He did not remember the two officers, nor did he have any conversation with them. He did not see any girls approach them or talk to them. He was asked if he served them any drinks that night and he said maybe he had but that he did not remember. He testified that he saw the officers in the bar after they came back with the girls and arrested him. The officers told him that he was under arrest and he asked them what for.

Tom Poulos was employed by his father-in-law, Steve Juris, who owned the property. He further testified that he had seen Mrs. Williamson in the lounge a couple of times before; that he did not recall having seen her that night as he was very busy serving drinks. He testified that the "place was packed" and he was working the bar back and forth; that the bar had from 30 to 35 stools and he was working all over the bar. He was also asked if he had mixed a drink of seltzer and plain water to which he answered that he never did that.

Steve Juris, a witness, testified that he runs the Hi-Hat Lounge; that he is the owner of the building and he has been there for sixteen years; that during that

447

period of time there have never been any arrests or violations in the premises, nor has he ever been cited before the Commission or any other Commission covering liquor law violations.

The application for a retailer's license showed on its back the following question: "Give date you began liquor business at this location," and the answer appearing on the back of the application was January 11, 1962. The witness, however, testified that that was wrong; that he opened the tavern on January 13, 1951. This discrepancy was explained by the fact that the corporation was organized in 1961 or 1962, and the tavern was operated by the corporation since that time. Mr. Juris had operated the tavern since 1951 excepting for a few years that he was away and the license was issued in the name of his nephew.

██ The sole question to be determined in this case is whether the decision of the defendant was contrary to the manifest weight of the evidence. There can be no doubt that in order to justify the revocation of a license, where the licensee is charged with permitting solicitation for prostitution on the licensed premises, such solicitation must be shown to have taken place with the permission and knowledge of the licensee. The State argues that the bartender was standing at the bar when Miss Brown said to Officer Smith that the dark-haired bartender would know what to make for her, and he proceeded to pour a half a glass of seltzer water and fill it up with plain tap water. Even if this conversation was overheard by the bartender, and there was no evidence that it was, it would not sustain a charge of permissive solicitation for prostitution on the premises of the licensee. There is no evidence in the record that indicates that Poulos, the bartender, overheard any conversation between Officer Smith and either of the girls. The testimony of Officer

Smith to the effect that he was talking to the girl in the same tone of voice he employed in ordering drinks from the bartender might have indicated that the bartender could have heard him if he were facing the bartender and the bartender was paying any attention to the conversation. However, that testimony did not indicate the tone of voice used by the girl with whom Smith was talking, and there is nothing to indicate that her conversation could have been heard by the bartender in a busy bar with approximately 20 people sitting on stools talking. Furthermore, it does not seem plausible to this court that the girl would talk in a voice loud enough for the bartender to hear her, because others seated at the bar could also hear their conversation under those circumstances. The Chairman of the Illinois Liquor Control Commission realized this at the close of the Commission's case and asked the two officers if they had ever been told that it was necessary to show that the licensee or his agents overheard the conversation relating to solicitation, yet for some reason, not apparent to this court, the Commission proceeded to revoke plaintiff's license.

The defendant cites Show of Shows, Inc. v. Illinois Liquor Control Commission, 86 Ill App2d 109, 230 NE2d 268, wherein the charge against the licensee was that girls solicited drinks on the licensed premises of the plaintiff. The testimony there was that the bartender was opposite the officer at the bar when the solicitation took place. In that case there was conflicting evidence, which, of course, was a matter for the Commission to decide. A further distinguishing factor from the case at bar is that the girls were employees of the licensee and the Commission under the testimony could readily have reached the conclusion from the evidence that the girls were working together with the licensee through the bartender. Here there is no apparent conflict in the

evidence. There just is no evidence that the bartender heard the solicitation by the girl.

The Commission also cites Cermak Club, Inc. v. Illinois Liquor Control Commission, 30 Ill2d 90, 195 NE2d 178, in support of its contention that the evidence in this case was sufficient to authorize the revocation of the license. However, in Cermak Club, Inc., supra, the court said at page 91:

> "The licensees do not question the sufficiency of the evidence heard by the Commission to support its findings, nor do they question that those findings establish violations of law which justify revocation. They were charged before the Commission with violation of Rule 3 of the Commission, and both in the trial court and in this court they have challenged the constitutionality of that Rule."

The evidence in that case was not set out in the opinion, nor was its sufficiency passed upon by the court. The only similarity between that case and the instant case is that the licensee was charged with having permitted solicitation for prostitution on the licensed premises.

Other cases cited by defendant have been examined by us and are no more persuasive than the Cermak Club, Inc. case, supra.

We conclude, therefore, that since the evidence did not show either knowledge or permission by the licensee of the acts complained of, the decision of the Circuit Court of Cook County must be reversed.

Reversed.

DEMPSEY, P. J. and SCHWARTZ, J., concur.